IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| KEVIN BERRY, | § | |
| | § | No. 357, 2024 |
| Defendant-Below, | § | |
| Appellant, | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | Cr. ID No. N2307003037 |
| STATE OF DELAWARE, | § | |
| | § | |
| Appellee. | § | |

Submitted: June 18, 2025
Decided: September 15, 2025

Before **SEITZ**, Chief Justice; **VALIHURA**, **TRAYNOR**, **LEGROW**, and **GRIFFITHS**, Justices, constituting the Court *en Banc*.

Upon appeal from the Superior Court of the State of Delaware: **AFFIRMED.**

Patrick J. Collins, Esquire, Collins Price Warner Woloshin, Wilmington, Delaware, *for Appellant Kevin Berry.*

Matthew C. Bloom, Esquire, Delaware Department of Justice, Wilmington, Delaware, *for Appellee State of Delaware.*

**LEGROW**, Justice, for the Majority:

A Superior Court judge convicted the defendant, Kevin Berry, of first-degree murder and related weapons charges in the death of Thaddeus Blackman. Berry's identity as the shooter was the primary fact in dispute at trial, and one witness, Darnella Spady, identified Berry as the shooter when she was questioned by police. At trial, however, Spady did not want to testify. After unsuccessfully attempting to invoke the Fifth Amendment, Spady testified that she could not remember Blackman's shooting or the statement she gave to police.

The State sought to admit Spady's out-of-court statement to police as affirmative evidence under 11 *Del. C.* § 3507. After the State asked foundational questions of Spady and the chief investigating officer, the court admitted Spady's out-of-court statement over Berry's objection. Berry now appeals his convictions on the basis that the trial court erred in admitting that statement. Through his appeal, Berry seeks to reverse this Court's recent ruling in *McCrary v. State*, which refined the foundation that the State must establish through a declarant witness before an out-of-court statement is admissible as affirmative evidence under Section 3507. We decline to revisit that precedent because Berry has not identified an urgent reason to do so, and we affirm Berry's convictions.

## I. FACTUAL AND PROCEDURAL BACKGROUND

At approximately 12:40 p.m. on May 9, 2023, Thaddeus Blackman was leaving the Lucky Stop convenience store on the corner of Market and Gordon Streets in Wilmington when a masked gunman shot him three times at close range.[1] The shooter was dressed in black with a hood covering his head and a mask covering his face. Surveillance video from the area showed the shooter emerging from an adjacent alleyway on Gordon Street shortly before murdering Blackman.[2]

Police found Blackman unresponsive at the scene.[3] After efforts to revive him were unsuccessful, Blackman was transported to the hospital, and police processed the area for evidence. Among the evidence that they collected was surveillance video obtained from Lucky Stop and Milton Liquors, a nearby establishment on Market Street, and Ring camera footage from a neighboring home. The various camera angles showed the sequence of events and helped police identify witnesses who were present at the time of the shooting.[4]

The interior camera footage from Lucky Stop showed Isiah Barnett and Darnella Spady in the store before the shooting. Blackman entered the store as Spady was leaving, and exited the store himself about a minute later, just before the

---

[1] Opening Br. at 6; App. to Opening Br. at A50 (Trial Tr.).

[2] *Id.*

[3] *Id.*

[4] App. to Opening Br. at A129–30, A139 (Trial Tr.).

2

shooting.[5]  Exterior camera footage compiled from Lucky Stop, Milton Liquors, and the nearby residence traced the gunman's movements before and after the shooting. The shooter first walked up East 23rd Street, passing postal worker James DeMaio, and held his hand to his ear as though he were talking on a cellphone.[6]  The gunman then turned down an alleyway, proceeded onto Gordon Street, and toward Lucky Stop.[7]  The gunman passed Barnett, who was lingering near the intersection of Market Street and Gordon Street.[8]  At the same time, Spady was walking down Gordon Street toward Lamotte Street pushing a stroller of belongings when the shooter passed her on his way to Lucky Stop.[9]

After the gunman shot Blackman, he swiftly retraced his steps up Gordon Street, passed Spady again, and cut through the same alleyway onto East 23rd Street.[10]  The shooter passed DeMaio a second time, this time in the opposite direction, and walked briskly towards Lamotte Street.[11]  The Ring camera on Lamotte Street captured two individuals dressed in all black standing at the corner

---

[5] Opening Br. at 8.

[6] *Id.*

[7] App. to Opening Br. at A55 (Trial Tr.).

[8] *Id.* at A52 (Trial Tr.).

[9] *Id.* at A53 (Trial Tr.).

[10] *Id.* at A53, A55 (Trial Tr.).

[11] *Id.*

of East 23rd Street and Lamotte Street before they entered a residence at 31 East 23rd Street.[12]

Police interviewed Barnett, DeMaio, and Spady during the investigation. Barnett told police that he was visiting his uncle on Carter Street on the day of the shooting.[13] After leaving his uncle's home, Barnett passed two men exiting a silver sedan in the vicinity of East 23rd Street and Lamotte Street. Barnett recognized the vehicle as one that was often in the area.[14] The two individuals exited the car carrying a red Wawa bag, and Barnett described one as "light-skinned" and the other as "dark-skinned."[15] Both individuals stood at the corner of East 23rd Street and Lamotte Street before going into the house at 31 East 23rd Street.[16] Barnett then walked up Gordon Street and was standing on the corner of Market Street when he heard gunshots.[17] Barnett described the gunman as wearing all black with white lettering on his sweatshirt and with his face concealed except for his eyes.[18] The

---

[12] *Id*. at A56 (Trial Tr.).

[13] *Id*. at A60 (Trial Tr.). The State presented this information during its opening statements, but Barnett could not be located during the trial and was not called as a witness. We include the information that Barnett provided as background regarding the police investigation, not as evidence of Berry's guilt. Barnett's statement and his absence at trial are not relevant to the appeal, except that his absence from trial placed even more importance on Spady's identification testimony, a fact that the State does not dispute.

[14] *Id*.

[15] *Id*. at A61 (Trial Tr.).

[16] *Id*.

[17] *Id*. at A62 (Trial Tr.).

[18] *Id*.

4

only additional detail Barnett gave about the shooter was that he seemed young, consistent with the demeanor of the individuals Barnett had seen exit the silver sedan before the shooting.[19]

DeMaio described the gunman as thin and taller than five feet eight inches.[20] Seconds after hearing gunshots, he saw a man—dressed in all black with a black mask[21]—exit the alley with his hand in his pocket, walk quickly past him on East 23rd Street, and enter a residence at 31 East 23rd Street.[22] Before the gunman entered the residence, DeMaio noticed another individual on the porch.[23] He recalled seeing both men pacing the street about five minutes earlier, before he began his mail route.[24]

Detective Joseph Wicks, the chief investigating officer, identified Spady by canvasing the area of the shooting. When Detective Wicks approached Spady on the street, she acknowledged that she was the woman shown in a still image that Detective Wicks had taken from the surveillance video of the shooting.[25] Detective Wicks invited Spady to speak with him at the police station, but she never appeared.

---

[19] *Id.*

[20] *Id.* at A247 (Trial Tr.).

[21] *Id.* at A242–50 (Trial Tr.).

[22] *Id.* at A243–47 (Trial Tr.).

[23] *Id.* at A249–50 (Trial Tr.).

[24] *Id.* at A249–51 (Trial Tr.).

[25] *Id.* at A190 (Trial Tr.).

5

A few days later, on June 15, 2023, Detective Wicks spoke with Spady again on the street.[26] She agreed to be transported to the police station for an interview regarding Blackman's murder.[27]

During the interview, Spady exhibited signs of drug intoxication or withdrawal—she rocked back and forth, asked for several coats because she was cold, and dozed off a couple of times during the discussion. But Detective Wicks did not believe that Spady was intoxicated, and she gave clear and comprehensible answers to his questions.[28] Spady stated that she knew Blackman as "YG," and she identified the masked shooter as "Gunner."[29] Spady spoke with "Gunner" when he walked past her before the shooting, and she saw him run through the alleyway immediately after the shooting.[30] She described Gunner as having freckles,[31] and she identified 31 East 23rd Street as the location where she had previously purchased drugs from him.[32] Spady identified "Gunner's" right-hand man as an individual

---

[26] *Id*. at 192 (Trial Tr.).

[27] *Id*.

[28] *Id*. at A199 (Trial Tr.).

[29] *Id*. at A194, A205 (Trial Tr.); Statement of Darnella Spady at 1:14–1:22, played as Exh. 1 to the Court, *Berry v. State*, No. 2307003037 (Del. Super. Apr. 4, 2024) [hereinafter "Exhibit 1"].

[30] Exhibit 1, at 2:50–4:08.

[31] Statement of Darnella Spady at 9:35–9:43, played as Exh. 2 to the Court, *Berry v. State*, No. 2307003037 (Del. Super. Apr. 4, 2024) [hereinafter "Exhibit 2"].

[32] *Id*. at 2:41–2:49; *see also* Exhibit 1, at 5:02–6:01.

known as "Margeez."[33] Spady stated that after the shooting, Gunner threatened her and took her cellphone and identification, and she promised him that she would not identify him as the shooter.[34]

During her interview, Detective Wicks showed Spady three photo lineups. The first two lineups contained photographs of individuals the "Real Time Crime Center" had identified as using the alias "Gunner."[35] Spady did not identify any of those individuals as the shooter.[36] The third lineup included photographs of people known to frequent East 23rd Street, along with several "randomly placed individuals."[37] In that lineup, Spady recognized both Margeez and Gunner.[38] The photograph of the individual whom Spady identified as Gunner was Kevin Berry.[39]

On July 10, 2023, a grand jury indicted Berry on charges of Murder First Degree, PFDCF, and PFBPP. When Berry was arrested on July 18, 2023, he was carrying a cellular phone and keys to a silver BMW.[40] The BMW was searched, and a red Wawa bag was found on a rear floorboard of the passenger compartment.[41]

---

[33] Exhibit 2, at 7:39–7:55; *see also* App. to Opening Br. at A209.

[34] Exhibit 1, at 6:55–8:15.

[35] App. to Opening Br. at A207–08 (Trial Tr.).

[36] *Id*. at A207 (Trial Tr.).

[37] *Id*. at A208 (Trial Tr.)

[38] *Id*. at A209 (Trial Tr.).

[39] *Id*.

[40] *Id*. at A267–68 (Trial Tr.).

[41] App. to Opening Br. at A65, A358 (Trial Tr.).

Police executed a search warrant for 31 East 23rd Street, but the home was deemed uninhabitable, and no relevant evidence was found inside.[42] Another search warrant was executed for 466 Robinson Drive, Berry's reported residence, but neither the murder weapon nor the shooter's clothing was found.[43] A search warrant for cellphone tower records for Berry's phone indicated that his cellphone was located in the vicinity of the homicide around the time of the shooting.[44]

Berry waived his right to a jury trial and elected to proceed to a bench trial. As the trial court recognized, the case turned on the shooter's identification and "largely hinged" on Spady's testimony.[45] When the State called Spady to testify, she was uncooperative from the outset. Immediately after the State began its direct examination, Spady attempted to "plead the Fifth" and stated, "I don't want to witness anything."[46] The court advised Spady that she did not have a Fifth Amendment privilege under the circumstances, but the court allowed her to speak with counsel.[47] When Spady returned to the stand after consulting with counsel, she began testifying but repeatedly stated that she did not recall her interview with the

---

[42] *Id*. at A261 (Trial Tr.).

[43] *Id*. at A262 (Trial Tr.).

[44] *Id*. at A308 (Trial Tr.).

[45] *Id*. at A363; *see also* Answering Br. at 12 ("Berry's trial was about identification. One witness, Spady, provided the definitive link establishing that Berry was Blackman's killer.").

[46] App. to Opening Br. at A178 (Trial Tr.).

[47] *Id*. at A176–81 (Trial Tr.).

8

police. Spady explained that she had been up for several days using heroin and was under the influence when police spoke with her.[48] Spady similarly denied any recollection of the events that took place on the day of Blackman's murder, stating that she did not remember anything due to her heroin use.[49]

Throughout her testimony, Spady claimed a failure of memory in response to most of the State's questions.[50] She repeatedly stated that she was drunk or using drugs at the time, could not recall events, and had nothing to tell the State. Despite this claimed memory lapse, Spady did answer some questions. She admitted that she was the person in the video recording of her police station interview.[51] Although she claimed not to recall giving the statement, Spady was able to recall that she was brought into the station in handcuffs by two officers.[52] She further testified that she was truthful in her statement to Detective Wicks.[53] When shown police surveillance footage from the crime scene, she acknowledged that she was captured on video leaving Lucky Stop and later pushing a stroller down the street. Asked if this was the day that Blackman was killed, Spady responded, "I guess."[54]

---

[48] *Id*. at A184–86, A219 (Trial Tr.).

[49] *Id*. at A186–88, A219–22 (Trial Tr.).

[50] *Id*. at A181–83 (Trial Tr.).

[51] *Id*. at A185.

[52] *Id*.

[53] *Id*. at A216.

[54] *Id*. at A187–88. *See also id*. at A128.

After Spady's initial testimony, the State called Detective Wicks to testify about her interview and statement.[55] The State then moved to admit Spady's videotaped interview under 11 *Del. C.* § 3507.[56] Before the court ruled, Berry conducted a preliminary examination of Detective Wicks that probed Spady's intoxication during her interview and the voluntariness of her statement. Over Berry's opposition, the trial court then granted the State's motion to admit Spady's statement under Section 3507, holding that the State had laid the required foundation under the statute. The Court concluded that "[t]he threshold question is whether or not the witness gave a voluntary statement, and this Court concludes that she did . . . [and] under *McCrary*, I agree with the State that the Supreme Court has laid it out that this testimony meets the threshold. So it's admissible."[57]

In addition to Spady's testimony, the State called DeMaio, several officers who investigated the shooting and processed the evidence, the medical examiner, the DNA analyst, and an expert who analyzed the cell tower records. The State obtained a material witness warrant for Barnett but was unable to locate him to testify at trial.[58] Because the State had referred to Barnett's statements in its opening and he appeared in some of the video surveillance footage admitted into evidence,

---

[55] *Id*. at A189–200 (Trial Tr.).

[56] *Id*. at A200 (Trial Tr.).

[57] *Id*. at A204 (Trial Tr.).

[58] *Id*. at A233, A356 (Trial Tr.).

10

Berry moved for a mistrial.[59] The court denied that motion, stating that "it's up to me to decide whether or not that witness is credible. And I don't place any stock in witnesses that aren't here and didn't testify."[60]

At the close of the evidence, the court found Berry guilty of Murder First Degree, PFDCF, and PFBPP.[61] The court later sentenced Berry to life imprisonment plus ten years. Berry filed a timely appeal, arguing that the trial court erred and abused its discretion in admitting Spady's statement under Section 3507.

## II.   STANDARD OF REVIEW

This Court reviews "a trial court's ruling admitting or excluding evidence for an abuse of discretion."[62] "An abuse of discretion occurs when a court has exceeded the bounds of reason in light of the circumstances, or so ignored recognized rules of law or practice so as to produce an injustice."[63] We will reverse the trial court's factual findings only if they are clearly erroneous.[64] The trial court's legal conclusions are reviewed *de novo*.[65]

---

[59] *Id*. at A359 (Trial Tr.).

[60] *Id*. at A363 (Trial Tr.).

[61] *Id*. at A413 (Trial Tr.).

[62] *Milligan v. State*, 116 A.3d 1232, 1235 (Del. 2015).

[63] *Thompson v. State*, 205 A.3d 827, 834 (Del. 2019) (quoting *McNair v. State*, 990 A.2d 398, 401 (Del. 2010)).

[64] *Loper v. State*, 8 A.3d 1169, 1172 (Del. 2010).

[65] *Hall v. State*, 788 A.2d 118, 123 (Del. 2001).

11

### III.   ANALYSIS

Both of Berry's arguments on appeal relate to the admissibility of Spady's statement under Section 3507. Berry's primary argument is that this Court should reconsider and reverse its recent decision in *McCrary v. State*,[66] which in Berry's view upended established precedent and deprived the trial court of any discretion regarding the admissibility of Section 3507 statements. Second, even if we do not overrule *McCrary*, Berry argues that the State's questioning of Spady did not meet the foundational elements that *McCrary* requires before a trial court may admit an out-of-court statement as affirmative evidence. For the reasons set forth below, we conclude that Spady's police interview was properly admitted into evidence.

**A.   Berry has not offered any persuasive reason for this Court to revisit its decision in *McCrary*.**

In 1970, the Delaware General Assembly enacted what is now 11 *Del. C.* § 3507, which permits the use of prior out-of-court statements as affirmative evidence in criminal prosecutions.[67] The statute provides:

> **§ 3507. Use of prior statements as affirmative evidence.**
>
> (a) In a criminal prosecution, the voluntary out-of-court prior statement of a witness who is present and subject to cross-examination may be used as affirmative evidence with substantive independent testimonial value.

---

[66] 290 A.3d 442 (Del. 2023).

[67] 11 *Del. C.* § 3507; 57 Del. Laws ch. 525 (2025). The statute originally was codified at 11 *Del. C.* § 3509. It has not changed substantively since it was adopted.

(b) The rule in subsection (a) of this section shall apply regardless of whether the witness' in-court testimony is consistent with the prior statement or not. The rule shall likewise apply with or without a showing of surprise by the introducing party.

(c) This section shall not be construed to affect the rules concerning the admission of statements of defendants or of those who are codefendants in the same trial. This section shall also not apply to the statements of those whom to cross-examine would be to subject to possible self-incrimination.

The statute does not set forth a roadmap for how the proponent of a prior statement may seek its admission, but several decisions of this Court have interpreted the statutory language as imposing certain foundational elements to admissibility. In *Keys v. State*—the Court's first opportunity to interpret the statute—we held that the statutory language required the State to produce the declarant at trial and directly examine her.[68] The *Keys* Court did not prescribe any "precise form of direct examination," but the Court held that the questioning "should touch both on the events perceived and the out-of-court statement itself."[69] Later, in *Ray v. State*, this Court held that the declarant witness also must testify about the truth or falsity of the out-of-court statement.[70]

These foundational requirements came to be known as the "touching-on" requirements, and they guided Section 3507's application in both the trial court and

---

[68] 337 A.2d 18, 22–23 (Del. 1975).

[69] *Id*. at 23.

[70] 587 A.2d 439, 443 (Del. 1991).

this Court in the decades that followed the statute's adoption. In some of the cases applying those requirements, this Court's rulings implied that the declarant-witness must give in-court substantive testimony about the events perceived, the out-of-court statement, and the truthfulness of the statement.[71] But in other cases, the Court did not require a particular level of substantive testimony,[72] and in our recent decision in *McCrary* a majority of this Court clarified that "a particular level of testimony is not required to lay a foundation for introducing a prior statement under Section 3507."[73]

### i. The *McCrary* decision

In *McCrary*, the Court addressed the admissibility of an out-of-court statement by a child witness, L.F. L.F.'s out-of-court statement identified McCrary—a classroom aide and bus monitor at L.F.'s preschool—as engaging in sexual conduct against L.F. When she was called to testify, however, L.F.'s memory was limited. She identified McCrary in court as the monitor on her bus, testified that she talked to a woman about "bad touches," and stated that she told the truth when she talked about the "bad touches."[74] But L.F. could not recall the person who gave the bad touches, and she did not otherwise provide testimony that connected

---

[71] *See, e.g. Black v. State*, 3 A.3d 1077, 1082–83 (Del. 2010).

[72] *See, e.g. Johnson v. State*, 338 A.2d 124, 128 (Del. 1975).

[73] *McCrary v. State*, 290 A.3d 442, 459–60 (Del. 2023).

[74] *Id*. at 448–49.

14

McCrary to the bad touches.[75]  On appeal, McCrary argued that the State failed to satisfy the touching-on requirements because L.F. did not testify during her direct examination about the events that she allegedly perceived.  A majority of this Court disagreed, holding that L.F.'s in-court testimony satisfied Section 3507's foundational requirements, and the trial court's admission of her prior statement therefore was not an abuse of discretion.[76]

The majority opinion discussed precedent interpreting the touching-on requirements, exploring their origins and the practicalities undergirding them.  In particular, the *McCrary* court highlighted *Keys*' requirement that the State produce the witness and conduct a direct examination about both the events perceived and the statement itself.  The Court explained that these requirements stemmed from a concern that merely making the declarant-witness available, while leaving it to the defendant to call the declarant-witness, would improperly shift the burden to the defendant and create the impression that the defendant was sponsoring the witness.[77]

The *McCrary* court explained that the touching-on requirements "are manifestations of the Confrontation Clause and should be informed by Confrontation Clause jurisprudence."  A witness who does not provide substantive testimony on a

---

[75] *Id*. at 449.

[76] *Id*. at 463.

[77] *Id*. at 456 (citing *Keys v. State*, 337 A.2d 18, 23–24 (Del. 1975)).

15

topic nevertheless may be subject to cross examination on that topic, and a factfinder may evaluate a witness's credibility even if that witness claims not to recall anything about a prior statement or an event.[78] In fact, as earlier precedents recognized—and as *McCrary* expressly reaffirmed—Section 3507 does not guarantee any particular quality of cross examination, and a witness's prior statement may be admitted even if the witness has a limited memory on the stand or claims not to have perceived the event or made the statement.[79] "[T]here is nothing in [Section 3507] or its intent which prohibits the admission of the statements on the basis of limited courtroom recall."[80]

The *McCrary* majority opinion identified precedents of this Court which implied that a prosecutor could satisfy the Section 3507 touching-on requirements by calling the witness and asking questions during direct examination about the events perceived and the out-of-court statement, regardless of whether the witness's responses offered any substantive testimony about those topics.[81] But the majority acknowledged that other decisions "imply that the 'touching on' requirements

---

[78] *Id.* at 459–60.

[79] *Id.* at 457, 460.

[80] *Johnson v. State*, 338 A.2d 124, 127 (Del. 1975).

[81] *McCrary*, 290 A.3d at 458–59.

16

mandate at least some level of substantive testimony from a witness about the events perceived and the out-of-court statement itself."[82]

*McCrary* expressly adopted the former framework, explaining that the purpose of the touching-on requirements was to ensure that the State opened the door to cross examination on those topics, thereby allowing the defendant to test the credibility of the prior statement and the factfinder to evaluate its truthfulness.[83] Given that purpose, a prosecutor need not elicit a particular level of testimony about the events perceived or the prior statement or obtain substantive testimony that the prior statement was true in order to admit the statement under Section 3507.[84] Accordingly, "what matters" for purposes of Section 3507 is that the factfinder is able to evaluate the witness's credibility and that the defendant is able to question the witness about the prior statement and the events perceived without appearing to sponsor his testimony.[85]

Two justices dissented from the portion of *McCrary* that affirmed the admission of L.F.'s out-of-court statement under Section 3507. In the view of the dissenting justices, the foundational requirements of Section 3507 mandate substantive testimony by the declarant-witness about the events perceived and the

---

[82] *Id*. at 459.

[83] *Id*. at 459–60.

[84] *Id*. at 459–61.

[85] *Id*. at 460.

17

out-of-court statement.[86] The dissenting justices would have excluded L.F.'s statement because—although she was asked questions about the events perceived and the out-of-court statement—her limited recall did not allow her to give sufficient testimony on either of those foundational points. The dissent expressed the concern that allowing Section 3507 statements to be admitted when the witness does not offer substantive testimony touching on the events perceived and the out-of-court statement would allow such statements to be used when a witness has a complete failure of memory, which could violate a defendant's confrontation rights.[87]

### ii. Berry's bid to overturn *McCrary*

On appeal, Berry argues that *McCrary* upended established jurisprudence and that this Court should revisit that decision and return to what Berry characterizes as "the longstanding principles informing" Section 3507's application.[88] Berry describes those principles as a "well-established process of case-by-case analysis to determine if Confrontation Clause rights are jeopardized" by the admission of the out-of-court statement.[89] Berry maintains that a witness must be required to testify substantively about the events perceived and the out-of-court statement, as well as the statement's truth, before the statement may be admitted under Section 3507. The

---

[86] *Id.* at 463–66.

[87] *Id.* at 466–68.

[88] Reply Br. at 3; Opening Br. at 34.

[89] Reply Br. at 1, 3.

18

admission of Spady's statement, Berry contends, demonstrates the Confrontation Clause issues that arise if a witness is not required to provide substantive testimony regarding the touching-on requirements: Spady's drug use left her with no memory, and Berry therefore could not effectively cross examine her or test the credibility of her out-of-court statement.

Berry's argument inviting this Court to revisit *McCrary* fails because it disregards principles of *stare decisis*. In an effort to side-step precedent, Berry raises a number of arguments, none of which meet the high standard that this Court requires before it will overturn its previous rulings. First, Berry places unwarranted emphasis on whether Spady was a "turncoat witness"—an issue that is not relevant for purposes of Section 3507's application. Next, Berry incorrectly argues that *McCrary* divests a trial court of all discretion regarding the admissibility of statements under the statute. And finally, Berry argues that *McCrary* allows the State to circumvent a defendant's confrontation rights, but the record demonstrates that Berry was permitted to confront Spady and in fact did so at trial.

### iii. *Stare decisis* **and the absence of an urgent reason or clear manifestation of error requiring the Court to overturn** *McCrary*

*Stare decisis* is "an essential feature of common law systems."[90] Adherence to precedent is fundamental to our legal system, allows for the predictable and

---

[90] *Brookfield Asset Mgmt., Inc. v. Rosson*, 261 A.3d 1251, 1278 (Del. 2021).

consistent application of the law, and "contributes to the actual and perceived integrity of the judicial process."[91]   Under the doctrine of *stare decisis*, courts overturn settled law "only 'for urgent reasons and upon clear manifestation of error.'"[92]  Even in cases involving constitutional claims, a "departure from precedent 'demands special justification.'"[93]

Berry offered no such special justification here.  In response to the State's reliance on *stare decisis*, Berry simply argued that the Court would not offend *stare decisis* by returning to previous cases that interpreted Section 3507 as requiring a witness to give substantive testimony on the touching-on requirements.[94]  Berry did not offer an "urgent reason" to revisit *McCrary*, such as inherent confusion created by the decision.[95]  He also did not identify a "clear manifestation of error."[96]  As discussed below, the trial court's admission of Spady's statement did not offend the Confrontation Clause and was consistent with the foundational requirements of Section 3507.

---

[91] *Id*. (quoting *Gamble v. United States*, 587 U.S. 678, 691 (2019)).

[92] *Seinfeld v. Verizon Communications, Inc.*, 909 A.2d 117, 124 (Del. 2006).

[93] *Gamble*, 587 U.S. at 691 (quoting *Arizona v. Rumsey*, 467 U.S. 203, 212 (1984)).

[94] Reply Br. at 3.

[95] *See Brookfield Asset Mgmt, Inc.*, 261 A.3d at 1278–79.

[96] *Id*. at 1278.

*Stare decisis* protects the interests of parties in the judicial system, who act in reliance on precedent. Those reliance interests are especially strong in criminal cases.[97] Merely disagreeing with the reasoning or holding of a previous case is not grounds to revisit it. This Court is particularly chary to overturn precedent where, as here, the only change is the court's composition.[98] For all those reasons, we meet Berry's invitation to revisit *McCrary* with a substantial degree of caution.

Although Berry never expressly identifies what he contends are the special circumstances justifying a retreat from *McCrary*, he advances a number of arguments intended to call *McCrary*'s reasoning into doubt. First, he contends that the analysis offered in *McCrary* focused on the need for Section 3507 in cases involving a turncoat witness, and he argues that Spady was not such a witness. We disagree with the premises underlying this argument.

For one, as Berry conceded at oral argument, *McCrary*'s application does not turn on whether a witness is a "turncoat."[99] To the contrary, the foundational requirements clarified in *McCrary* apply to witnesses generally, as the majority in *McCrary* expressly acknowledged.[100] In addition, Berry has not articulated any

---

[97] *Id.* at 1279 n.147.

[98] *Id.* at 1279. *McCrary* was decided recently but by a different composition of this court. The integrity of our judicial system is premised on the view that foundational principles are established in the law, not the "proclivities of individuals." *Vasquez v. Hillery*, 474 U.S. 254, 265–66 (1986).

[99] *See* Oral Argument at 7:05–8:39, *Berry v. State*, No. 357, 2024 (Del. June 18, 2025).

[100] *McCrary v. State*, 290 A.3d 442, 460 (Del. 2023) ("We believe that Section 3507 permits the introduction of a prior statement by a turncoat witness because, once the prosecutor has asked the

doctrinal reason to apply different foundational requirements depending on whether or not a witness can be considered a "turncoat," nor has he explored how a trial court would go about making that determination. Berry's arguments are primarily grounded in the Confrontation Clause, but he has not elucidated why a defendant's confrontation rights would turn on whether a witness has become "hostile" or uncooperative to the State. We find Berry's focus on whether Spady was a "turncoat witness" misplaced.[101]

Berry next argues that this Court should abandon *McCrary* because the foundational requirements that it adopts divest a trial court of all discretion regarding

---

questions and the witness has claimed not to recall, the factfinder can evaluate the truthfulness of the testimony of the turncoat witness, and the defendant can cross examine on those same topics without having to call the witness and seeming to sponsor their testimony. Those principles apply not only to a turncoat witness but to witnesses generally.").

[101] The use of a phrase like "turncoat witness" is pejorative and recalls a witness "whose testimony was expected to be favorable but who becomes (usually during trial) a hostile witness." *Id*. at 467 (dissenting op.) (quoting Black's Law Dictionary 1921 (11th ed. 2019)). It is equally—if not more—common that a percipient witness who voluntarily speaks to police later becomes intimidated by the idea of testifying at trial, either because that person fears reprisal or because the setting itself is daunting. The record could be read to view Spady's testimony in that light. Spady made it clear from her first moments on the witness stand that she wanted to "plead the Fifth" and did not want to "witness anything." App. to Opening Br. at A178 (Trial Tr.). When the trial court explained that she had to testify, Spady resorted to claiming a complete lack of memory due to drug use, repeating variations of "I can't remember" and "I was on drugs" in response to most questions. *See, e.g. id*. at A182–84, A185, A187, A220. But Spady then recalled specifics several times during her direct and cross examinations, including when she testified that she had been awake for several days before she spoke to police; that Detective Wicks picked her up with another officer and drove her to the police station; and that she was handcuffed when she was brought into the station. *Id*. at A185, A219. The trial court made no factual finding about whether Spady was a "turncoat witness," but there are reasons in the record to question whether her failure of memory was genuine, fear-based, or a combination thereof.

the admissibility of a Section 3507 statement.[102]  This argument ignores the purpose of the touching-on requirements and the "voluntariness" determination that a trial court must separately make before admitting a statement under Section 3507.

To reiterate, and as the *McCrary* court explained, the touching-on requirements' purpose is rooted in the Confrontation Clause.  The requirements exist to allow a defendant to cross examine the declarant witness and to allow the factfinder to evaluate the witness's credibility on the stand and in the out-of-court statement.  By requiring the State to call the declarant-witness to the stand and ask questions relating to the events perceived and the statement given, the witness is exposed to cross examination about those topics without the defendant having to call—and appear to sponsor—the witness.

Importantly, the touching-on requirements are not the only foundational elements that the State must meet to admit a statement under Section 3507.  Before the State may offer an out-of-court statement as affirmative evidence under the statute, it must demonstrate that the statement was given voluntarily.[103]  The trial judge must make a factual finding that the out-of-court statement was voluntary

---

[102] Reply Br. at 3 ("Post-*McCrary*, the prosecutor only has to ask a few questions of the declarant about the event perceived and the statement given.  It makes no difference what the answers are.  If the witness utters any words in response, the prior statement must be admitted.  The judge has no discretion."); *see also* Oral Argument at 4:24–4:57, *Berry v. State*, No. 357, 2024 (Del. June 18, 2025) (Berry's counsel arguing that the prosecutor alone controls the admissibility of an out-of-court statement under Section 3507).

[103] *Wyche v. State*, 113 A.3d 162, 165 (Del. 2015); *Smith v. State*, 669 A.2d 1, 7 (Del. 1995).

23

before the jury may hear it.[104]  That factual determination is based on the "totality of the circumstances" and is intended to determine "whether the witness's 'will was overborne' such that the proffered Section 3507 statement was not 'the product of a rational intellect and a free will.'"[105]  The trial court's determination weighs numerous factors, including the interrogation, the particular characteristics of the declarant, and the tactics used by police to elicit the admissions.[106]

In Berry's case, the trial court determined that Spady's out-of-court statement was voluntary, and Berry has not challenged that finding on appeal.  But Berry's argument that the prosecutor now "controls" admissibility post-*McCrary* cannot be squared with the voluntariness requirement and the associated factual finding that the trial court must make under our precedent.

Finally, Berry argues that *McCrary*'s application in this case demonstrates that a witness must provide substantive testimony on the touching-on requirements to ensure that a defendant's rights under the Confrontation Clause are respected.  But *McCrary* explains that "a witness need not provide substantive testimony on a topic to be subject to cross examination on [that] topic[] or to have the truthfulness of their

---

[104] *Smith*, 669 A.2d at 7.

[105] *Wyche*, 113 A.3d at 165–66 (quoting *State v. Rooks*, 401 A.2d 943, 949–50 (Del. 1979)); *see also Collins v. State*, 56 A.3d 1012, 1018 (Del. 2012).

[106] *Starling v. State*, 130 A.3d 316, 328–29 (Del. 2015); *Baynard v. State*, 518 A.2d 682, 690 (Del. 1986).

testimony assessed."[107] The trial court did not limit defense counsel's cross examination, and counsel asked Spady numerous questions on cross. The Confrontation Clause "guarantees an *opportunity* for effective cross-examination, not cross examination that is effective in whatever way, and to whatever extent, the defense might wish."[108] As a result, a witness's memory lapse does not deny a defendant his rights under the Confrontation Clause.[109] The United States Supreme Court has held that the right of cross-examination is "fully satisfied," despite a witness's failure of memory, as long as the factfinder can observe the witness's demeanor under cross examination and the witness is testifying under oath and in the presence of the accused.[110]

Even if there may be circumstances "in which a witness's lapse of memory may so frustrate any opportunity for cross-examination" as to violate the Confrontation Clause,[111] the record dispels Berry's argument that Spady's failure of memory precluded any opportunity to cross examine her. Defense counsel questioned Spady at length, probing her copious drug use and the effects of those drugs on her perception and memory. Counsel repeatedly confirmed that Spady

---

[107] *McCrary v. State*, 290 A.3d 442, 459 (Del. 2023).

[108] *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985). *See also El-Abbadi v. State*, 312 A.3d 169, 193 (Del. 2024).

[109] *Fensterer*, 474 U.S. at 19–20.

[110] *Id*. at 20.

[111] *Id*.

could not remember anything of substance because of her heroin use.[112]  The trial judge as factfinder could consider the effect of Spady's heroin use on her ability to observe Blackman's murder, recognize and correctly identify the shooter, and provide a reliable statement to the police.

On appeal, Berry identifies a host of other questions that he contends counsel was unable to ask during cross examination: (i) how Spady was able to observe Gunner "in the moment, which lasted a few seconds at most in a stressful situation"; (ii) how Spady was able to witness the shooting when the surveillance footage showed her at least 50 feet away seconds after the shooting; (iii) how confident Spady was in her identification of Gunner, given that he was masked and hooded; (iv) how Spady knew the shooter as "Gunner"; (v) how certain Spady was that Gunner lived at 31 East 23rd Street; and (vi) where and when Gunner purportedly took Spady's phone.[113]  But defense counsel could have asked Spady all those questions, and her answers—or her inability to answer them—could have informed the factfinder's judgment regarding her credibility.

At oral argument on appeal, counsel stated that he did not ask the questions because he did not believe that he would get a response.[114]  But a witness's inability

---

[112] App. to Opening Br. at A217; A219–21 (Trial Tr.).

[113] Opening Br. at 43–44.

[114] Oral Argument at 19:01–19:59, *Berry v. State*, No. 357, 2024 (Del. June 18, 2025).

to answer questions can itself discredit her testimony.[115]  Moreover, as previously discussed, Spady's failure of memory was not absolute; at several points during her in-court testimony she recalled specific details.[116]  Berry's counsel's decision not to ask certain questions cannot be equated with the lack of an opportunity to do so.

In short, none of the arguments that Berry raises constitute an urgent reason to revisit *McCrary* or a clear manifestation of error resulting from *McCrary*.  This Court requires such a showing before it will revisit precedent.  The standards announced in *McCrary* continue to govern the admissibility of out-of-court statements under Section 3507.

**B.      The State's direct examination of Spady satisfied Section 3507's foundational requirements.**

Berry separately argues that even if this Court does not reverse *McCrary*, the State's direct examination of Spady did not satisfy Section 3507 because the State did not ask questions touching on the event perceived.[117]  He contends that because the State did not ask Spady whether she was present for or witnessed the killing, her out-of-court statement was not admissible.[118]  We disagree.

---

[115] *See Fensterer*, 474 U.S. at 19.

[116] *See infra* note 101.

[117] Opening Br. at 46.  Berry does not argue that the State did not satisfy the touching-on requirements regarding Spady's out-of-court statement.

[118] Reply Br. at 6.

27

Notwithstanding Spady's repeated testimony that she lacked memory as a result of her drug use, the State questioned her about Blackman's shooting and her presence in the area that day. Specifically, to address her claimed memory loss, the State showed Spady the video surveillance of the minutes before, during, and after Blackman's shooting.[119] Spady confirmed that she was in the video and that she could be seen walking into Lucky Stop in the video.[120] The prosecutor then showed Spady a point in the video in which she was walking down the street with a stroller, and she confirmed again that it was her.[121] The State then asked, "and that was when [Blackman] was killed, right?" and Spady responded, "I guess so."[122] Those questions confirmed that Spady was present when Blackman was shot and subjected her to cross-examination about the events of that day.

We review a trial court's decision to admit evidence for abuse of discretion.[123] The trial judge held that Spady's testimony met the threshold for admissibility.[124] The State's questions, which sought to draw out substantive testimony from Spady regarding her presence at the scene when Blackman was killed, can be viewed as

---

[119] App. to Opening Br. at A187 (Trial Tr.).

[120] *Id.*

[121] *Id.* at A188 (Trial Tr.).

[122] *Id.* at A187–88 (Trial Tr.).

[123] *Milligan v. State*, 116 A.3d 1232, 1235 (Del. 2015).

[124] App. to Opening Br. at A204 (Trial Tr.).

touching on the events perceived.  The trial court's holding did not exceed the bounds of reason or ignore recognized rules of law or practice, and it therefore did not constitute an abuse of discretion.

## IV.   CONCLUSION

For the foregoing reasons, we AFFIRM the Superior Court's decision and Berry's convictions.

**TRAYNOR**, Justice, dissenting:

I agree with my colleagues in the majority that the trial court's admission of Darnella Spady's out-of-court statement—the evidence upon which the prosecution, in the trial court's words "largely hinge[d]"[125]—can be squared with this Court's majority opinion in *McCrary*. Even so, for the reasons stated in my dissent in that case and because I perceive that Berry's first-degree murder conviction and life sentence rest on an out-of-court statement, the truthfulness of which could not be tested by cross-examination in any meaningful way, I respectfully dissent.

My dissent proceeds from the premise that Spady's inability to recall either the events in question or her statement to Detective Wicks was not a contrived memory lapse or the type of partial memory failure that is endemic to the human condition. Although skeptical of that premise,[126] the majority's reasoning implies that the legitimacy of a witness's total memory loss is irrelevant to the admissibility of the witness's statement under § 3507. If my reading of the majority's reasoning is correct that a witness's memory loss is not feigned but real simply does not matter. If, according to the majority, the witness is called to the stand by the prosecution and the trial court finds that the prior out-of-court statement was made voluntarily—a determination no doubt complicated by the witness's memory loss—the statement

---

[125] App. to Opening Br. at A363.
[126] *See* Majority Op. at 22 n. 101.

comes in, no matter that cross-examination will be nothing more than an empty exercise.[127] This, it seems to me, devalues the premium our jurisprudence has traditionally assigned to the role of cross-examination in the truth-seeking process.

As Justice Scalia observed in his pivotal Confrontation Clause opinion in *Crawford v. Washington*, "the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused."[128] Before *McCrary*, this Court was mindful of this focus and thus aspired to carefully circumscribe the use of § 3507 to secure criminal convictions.[129] *McCrary*, as I endeavored to explain in my

---

[127] The implications of using § 3507 as a vehicle for introducing an out-of-court statement of a witness whose memory loss is complete and demonstrably real are troubling. One need only consider a witness who suffers from Alzhemier's disease and consequently has no memory whatsoever of the facts that form the subject matter of her out-of-court statement or the statement itself. Under the majority's reading and application of *McCrary*, a trial court may accord the witness's uncross-examined out-of-court statement substantive, independent, testimonial value upon a finding, based solely on the testimony of the person who heard the statement—in most instances a police officer—that it was made voluntarily. I find such a scenario worrisome.

[128] 541 U.S. 36, 50 (2004). I note that Berry has not argued that the admission of Spady's out-of-court statement violated his Confrontation Clause rights.

[129] *See, e.g.*, *Ray v. State*, 587 A.2d 439, 444 (1991) ("[T]he use of hearsay statements under section 3507 must be carefully circumscribed in order to avoid, as occurred here, the only direct evidence concerning the commission of the offense against a child being presented through the testimony of third parties relating what the victim stated on a prior occasion."); *see also Johnson v. State*, 338 A.2d 124, 128 (Del. 1975) (adopting a case-by-case approach to determining whether introduction of an out-of-court statement under § 3507 violates the Confrontation Clause because of the lack of effective cross-examination); *Keys v. State*, 337 A.2d 18, 24 (Del. 1975) (Quillen, C., concurring) (recognizing potential unfairness when the State is "permitted to prove its case through a single police witness who did not see the incident and who relied solely on what eyewitnesses told him.").

dissent in that case, undermined that effort, and this case administers the *coup de grâce*.

To be clear, I accept that a witness's fading memory of the relevant events and her out-of-court statement should not categorically preclude admission of the statement under § 3507, assuming other foundational requirements are met. But I would hew more closely than the majority does to our Court's statement in *Ray*, which we more recently reiterated in *Blake*,[130] that "a witness'[s] statement may be introduced [under § 3507] only if . . . [she is] subject to cross-examination on the *content of the statement as well as its truthfulness*."[131] Here, because of Spady's total memory loss occasioned by chronic heroin and alcohol intoxication, she was not, practically speaking, subject to cross-examination on the content of her statement.

Nor am I persuaded by the majority's conclusion that, because Spady confirmed that she was the person depicted on the surveillance video, her testimony on direct examination sufficiently "touched upon" the events that formed the subject matter of her out-of-court statement.[132] This testimony, without more, does not

---

[130] *Blake v. State*, 3 A.3d 1077, 1083 (Del. 2010).

[131] *Ray*, 587 A.2d at 443 (emphasis added) (citing *Johnson* 338 A.2d at 127).

[132] My concern here assumes that *McCrary* has not eliminated the guidance provided in *Johnson*, *see supra* note 129, that the Court will engage in a case-by-case analysis to determine whether introduction of an out-of-court statement under § 3507 violates the Confrontation Clause when cross-examination is, as a practical matter, precluded.

establish that, when Spady was testifying, she had personal knowledge concerning the relevant events and, in particular, the identity of the shooter.[133] Her testimony, in fact, suggested the opposite.

Admittedly, Berry has not argued that the admission of Spady's statement to Detective Wicks violated his confrontation rights under the Sixth Amendment. Yet it bears noting this Court has repeatedly recognized the threat that the unbridled deployment of § 3507 can pose to an accused's right to confront and cross-examine the prosecution's witnesses. The trend of this Court's jurisprudence, as evidenced by *McCrary* and the majority opinion in this case, suggests a diminished concern for the rights of the accused in this area. I find that regrettable.

But even though a constitutional claim under the Confrontation Clause was not made or may not be viable in this case, our trial courts are yet required to exercise their sound discretion when determining the admissibility of statements under § 3507. In this case, I would find that the trial court's admission of Spady's *ex parte*,

---

[133] One scholar has questioned how a witness who has no memory of the underlying events and her prior out-of-court statements "would be allowed to testify at all, because . . . the witness could not possibly meet the personal knowledge requirement that is required of all witnesses." Ann M. Murphy, *Vanishing Point: Alzheimer's Disease and its Challenges to the Federal Rules of Evidence*, 2012 MICH. ST. L. REV. 1245, 1267 (2012); *see also* D.R.E. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."). I acknowledge that Berry did not challenge Spady's competency to testify on this ground, nor has he raised this issue on appeal.

out-of-court statement as the principal evidence of Berry's guilt was an abuse of discretion.